LA COMPANIA BILBAINA DE NAVIGACION DE BILBAO *v.* SPANISH-AMERICAN LIGHT & POWER CO.[1]

*(District Court, S. D. New York. June 14, 1887.)*

CHARTER-PARTY — PRINCIPAL AND AGENT — AUTHORITY EXCEEDED — FAILURE TO RATIFY — CROSS-SUITS — DISMISSAL.

In the charter-party of a vessel were inserted two clauses, one of which required the vessel to fit up oil-tanks. In signing this charter, the broker for the foreign owners exceeded his authority, and this fact was known at the time to the charterer's broker. The foreign owners refused to confirm the inserted clauses, while the charterers never receded from their position requiring their retention. Nevertheless, the vessel made one voyage for the charterers; but, as soon as the question of the disputed clauses arose, the original dispute was renewed. The owners afterwards fitted up the tanks, at considerable expense and delay. The owners sued to recover the expense of fitting up the tanks, and the charterers brought a cross-suit to recover their damages because the tanks were not fitted up earlier. *Held,* that the written charter never became a binding contract as a whole, though it was evidence of the implied contract in the subsequent use of the vessel so far as it was adopted without objection; and that neither side could found a claim against the other on the disputed clauses, upon which they had never agreed; and therefore both libel and cross-libel should be dismissed.

In Admiralty.

*Whitehead, Parker & Dexter,* for libelants.

*Wingate & Cullen,* for respondents.

BROWN, J. The written charter-party, signed by the broker of the libelants, did not constitute a legal contract binding upon either of the parties, because in signing it the broker exceeded his authority, and that fact was communicated at the time to the broker of the respondents. It was agreed between the brokers of each party, however, that if the clause relating to the extension of time to twelve months, and the clause requir-

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

ing the ship to fit up the oil-tanks at her expense were objected to by the owners, the matter should be settled by negotiation.

The respondents, from the first, refused the charter unless the ship should fit up the tanks at her expense, and that fact was stated to the libelants' broker at the time, and the owners of the ship in England subsequently refused to confirm the two clauses in the charter as proposed by the brokers. Notice of this refusal was given to the charterers, and they never consented to waive these two clauses. The agreement of the brokers was that, upon such a difference, the matter should be *settled* by negotiation. But it never was settled. Neither side apparently wished to push the matter to a settlement, though each understood the difference. No agreement as to these two clauses was ever arrived at, while both deemed them material. The subsequent conduct of each shows that neither side receded, or intended to recede, from its position. When the vessel arrived, ready for the first voyage, neither party made inquiry as to the disputed clauses. The duty of inquiry rested upon each alike, if they wished to have a fixed agreement. Both, in fact, assented to the use of the ship on the first voyage, without any definite agreement on the disputed points, and without the settlement by negotiation that had been agreed on by the brokers. The charterers did not object because they were not ready to use tanks. When the respondents were ready to use the tanks, and required the vessel to fit them up in pursuance of the terms of the charter, the libelants refused to do so. The cargo was then taken in barrels, under a stipulation that that might be done without prejudice to the rights of either; the respondents claiming damages for the extra expenses. Subsequently, the owners fitted up the tanks, claiming that the expenses would be at the charge of the charterers, while the latter notified the owners that they would not pay for any such expense.

As the written charter never became a binding contract as a whole, for the total want of authority in the broker of the ship-owners to insert the two very material stipulations in question, and as the charterers never agreed to accept the charter, except with those stipulations, and gave prompt notice thereof, and did nothing to mislead the owners, the charter-party, as such, never became a contract binding upon either. It may be referred to, however, as fixing the rights of each in so far as it must be presumed to have been actually adopted by both parties in their subsequent acts, and no further. The owners' failure to notify the charterers directly for several weeks after the charter had been signed, that they refused their assent to the two disputed clauses, was irregular, and perhaps somewhat negligent, on their part; but I do not think that material in the result, because the charterers were, I think, apprised of the verbal refusal of the owners to those terms. Nevertheless, the vessel came to the charterers without further request by them, and was tendered to them by the owners, without attempting any settlement of the disputed points. Both alike consented to the first voyage without any settlement of these differences. It is certain, however, that, as soon as any question was made between the master and the charterers about the

tanks after the first voyage, the original refusal of the owners was made known to the respondents, and neither of the parties ever agreed to the demands of the other on this subject. Without either side yielding anything to the other as to the charter, the ship was employed, and neither side refused further dealings, as they might have done.

Under that state of things, the terms of the charter must be deemed to constitute the implied agreement of the parties in the actual use made of the ship, in all except as to the disputed clauses. Neither party can found any claim against the other upon the clauses that the other party did not accept, but always and consistently refused to accept; because, in the face of such a refusal, no agreement to them can be implied. The owners, therefore, can recover nothing for their expenditures in fitting up the tanks to carry oil in bulk; nor can the charterers, by their cross-libel, recover any damages for the tanks not being fitted up earlier. For the same reason, also, the owners cannot recover for any time of the vessel lost while they were fitting up the tanks. They lose nothing by this disallowance, because it does not appear that any more time was required to fit up the tanks when the work was actually done, than would have been required when the vessel was brought over to the charterers. The evidence shows that, after the employment of the vessel had begun, neither side was desirous of insisting on its legal right to discontinue all further service by reason of the failure of the parties to come to an agreement upon the disputed clauses of the written charter. The rights and liabilities of the parties are founded, as I have said, not at all upon the written charter-party, but wholly upon their subsequent conduct in the actual use of the ship. The charter-party is applied, by implication, to these acts, so far as it presumptively indicates the intention of both, and no further. There can be no implied promise or obligation in contradiction of the expressed refusal of either. The result is that neither has any claim upon the other for the damages set forth by them respectively; and the libel and the cross-libel must therefore each be dismissed, except as respects the hire unpaid, if any, for the time of the actual use of the vessel by the charterers.